**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| JOHN RAMIREZ-PRADO, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )    Case No. 1:21-cv-02601-TWP-MG |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

## ORDER ON MOTION  FOR RELIEF PURSUANT TO28 U.S.C. § 2255 AND DIRECTING FURTHER PROCEEDINGS

This matter is before the Court on Petitioner John Ramirez-Prado's ("Ramirez")[1] *pro se* Amended Motion to Vacate his conviction and sentence pursuant to 28 U.S.C. § 2255 (Dkt. 8), and two Motions for Case Status and Ruling (Dkts. 32, 33). In August 2018, following a multi-defendant, multi-week criminal trial, a jury convicted Ramirez of Count One: Conspiracy to Distribute Controlled Substances, and Count Four: Conspiracy to Launder Monetary Instruments. *United States v. Rojas-Reyes, et al.*, No. 1:16-cr-00123-TWP-MJD ("Crim. Dkt."). Ramirez is serving a 240-month prison sentence. He asks the Court to vacate his conviction and sentence on grounds that he was deprived of his Sixth Amendment right to effective assistance of counsel. For the reasons discussed in this Order, the § 2255 Motion is **denied in part** and the Court directs further proceedings on two of the claims. The motions for case status are **granted**, in that this order states the status of this case and issues a ruling.

---

[1] At trial, the movant was referred to as "Ramirez" rather than "Ramirez-Prado", (Crim. Dkt. 813 at 8:17-20), so the Court will address him as Ramirez in this Order.

## I.    THE § 2255 MOTION

A motion pursuant to 28 U.S.C. § 2255 is the presumptive means by which a federal prisoner can challenge his conviction or sentence. *See Davis v. United States*, 417 U.S. 333, 343 (1974). A court may grant relief from a federal conviction or sentence pursuant to § 2255 "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "Relief under this statute is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878–79 (7th Cir. 2013) (citing *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996); *Barnickel v. United States*, 113 F.3d 704, 705 (7th Cir. 1997)).

## II.    BACKGROUND

A grand jury indicted Ramirez and 16 co-conspirators in January 2017 (Crim. Dkt. 142). Several of his co-defendants entered pleas of guilty and, a year later, a Second Superseding Indictment trimmed the total number of defendants to twelve (Crim. Dkt. 416). By August 2018, only four defendants remained. Ramirez proceeded to a joint jury trial with co-defendants Rafael Rojas-Reyes ("Rojas-Reyes"), Hector Saul Castro-Aguirre ("Castro-Aguirre"), and Jose Manuel Carrillo-Tremillo ("Carrillo-Tremillo"). The trial began on August 6 and concluded on August 20, 2018.

The jury returned guilty verdicts on each count charged against each defendant (Crim. Dkt. 669). It convicted Ramirez of conspiracy to distribute controlled substances (at least 500 grams of methamphetamine and 5 kilograms of cocaine) and conspiring to launder monetary instruments.

2

*Id.* at 13-15. Ramirez's advisory guideline range was 360 months to life in prison. The statutory term of imprisonment for Count One was a minimum term of 10 years and a maximum term of life, pursuant to 21 U.S.C. § 841(b)(1)(A); and for Count Four, a maximum term of 20 years in prison, pursuant to 18 U.S.C. § 1956(a)(1). The Court sentenced Ramirez to 240 months on the drug charge and 120 months on the money laundering charge, to run concurrently (Crim. Dkt. 778 at 2).

Ramirez appealed, *United States v. Castro-Aguirre, et. al*, 983 F.3d 927 (7th Cir. 2020), and the facts of the case relevant to Ramirez, as stated by the Seventh Circuit are as follows:

> Illegal drugs often do not originate in the community where they are consumed, and so the drug business—like its legitimate counterparts—commonly includes a complex distribution network. That was true of the arrangement [here], which involved large quantities of cocaine and methamphetamine that moved throughout the southwestern and northeastern United States. Eventually the government caught up with the participants. Among those it indicted were four who chose to go to trial: Jose Manuel Carrillo-Tremillo, Hector Saul Castro-Aguirre, John Ramirez-Prado, and Rafael Rojas-Reyes . . .
>
> The [four] defendants [who went to trial] all played active roles in a cross-country drug organization: [Saul] Castro-Aguirre served as the head of operations; [John] Ramirez-Prado handled logistics, including providing cars and hotels for distributors and couriers; [Rafael] Rojas-Reyes coordinated sales in Indianapolis; and Carrillo-Tremillo conducted sales in the northeast. To set the stage, we provide a brief overview of their activities from 2015 to 2016.
>
> Castro-Aguirre coordinated shipments of methamphetamine—usually 30 pounds apiece—from a trailer park in Tucson, Arizona, to Avon, Indiana (a suburb of Indianapolis). Ramirez-Prado rented SUVs and booked hotels for couriers along the route. Once the packages reached their destination, Rojas-Reyes took over and sold the methamphetamine in Indianapolis.
>
> Castro-Aguirre also handled cocaine sales in New Jersey and New York. Ramirez-Prado and other couriers transported bulk quantities of cocaine from Arizona and Indianapolis to New York. There, Castro-Aguirre fronted the drugs to Carrillo-Tremillo, who would sell them and remit the proceeds to Castro-Aguirre. In much the same way, Castro-Aguirre furnished Carrillo-Tremillo with anywhere from 10 to 100 kilograms of cocaine on credit for distribution in Reading, Pennsylvania. Castro-Aguirre arranged for couriers to pick up the proceeds from his various sellers and deliver the cash to him in Arizona.

3

> The final trip to Reading proved to be the downfall of the organization. The deal started out routinely, when Castro-Aguirre fronted 100 kilograms of cocaine to Carrillo-Tremillo. The drugs made it to Reading, but alert law enforcement officers caught up with the couriers and stopped them near the Illinois-Missouri border. There the agents seized $2,400,000.

*Id*. at 931-32. The Seventh Circuit affirmed Ramirez's conviction and sentences in December 2020. *Id*. at 942. He filed his Amended § 2255 motion in January 2022 (Dkt. 8). The Court addresses more detailed aspects of the trial record and the Seventh Circuit's decision below as they relate to Ramirez's § 2255 challenges.

### III.   **DISCUSSION**

Attorney Larry Champion ("Champion") represented Ramirez throughout the trial proceedings. Ramirez asks the Court to vacate his conviction and sentence on grounds that Champion's representation was ineffective in six different respects.

A § 2255 movant claiming ineffective assistance of counsel bears the burden of showing (1) that counsel's performance fell below objective standards for reasonably effective representation and (2) that this deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 688–94 (1984); *Resnick v. United States*, 7 F.4th 611, 619 (7th Cir. 2021).  If a petitioner cannot establish one of the *Strickland* prongs, the court need not consider the other. *Groves v. United States*, 755 F.3d 588, 591 (7th Cir. 2014).

To assess counsel's performance, the Court must "apply an objective standard of reasonableness considering all the circumstances." *Bridges v. United States*, 991 F.3d 793, 803 (7th Cir. 2021). "When a petitioner alleges that counsel was ineffective for failing to move to suppress evidence," he must "'prove the motion was meritorious.'" *Long v. United States*, 847 F.3d 916, 920 (7th Cir. 2017) (quoting *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005)).

On the prejudice prong, a petitioner "must show that but for counsel's errors, there is a reasonable probability that the result would have been different." *Perrone v. United States*, 889 F.3d 898, 908 (7th Cir. 2018) (cleaned up).

It is fundamental that the § 2255 movant faces the burden of demonstrating both deficient performance and prejudice. *See, e.g.*, *Williams v. United States*, 879 F.3d 244, 249 (7th Cir. 2018) ("To demonstrate prejudice, Williams had the burden to show a reasonable probability" of a different outcome "but for the failure by his counsel."); *Faucett v. United States*, 872 F.3d 506, 509 (7th Cir. 2017) ("Under . . . *Strickland* . . . , it was Faucett's burden to show that his attorney's performance was deficient and that he suffered prejudice as a result."); *Blake v. United States*, 723 F.3d 870, 879 (7th Cir. 2013) ("A party asserting ineffective assistance of counsel bears the burden of establishing" both deficient performance and prejudice); *Barker v. United States*, 7 F.3d 629, 633 (7th Cir. 1993) ("Because counsel is presumed effective, the petitioner bears a heavy burden to prove that his counsel was ineffective and that his defense was actually prejudiced."); *United States v. Springs*, 988 F.2d 746, 749 (7th Cir. 1993) ("Further proceedings on this subject would be a waste of time, because Springs has no prospect of establishing the 'prejudice' that is an element of his burden under the sixth amendment."); *United States v. Davenport*, 986 F.2d 1047, 1049 (7th Cir. 1993) ("[T]he burden of both proof and persuasion is" the movant's).

In his Motion, Ramirez argues his counsel's efforts were deficient in six respects: (1) failure to challenge cell site evidence; (2) failure to challenge warrantless seizure of cell tower data (the good faith exception to the exclusionary rule not met); (3) failure to challenge the credibility of cooperating witness Samaniego; (4) failure to challenge leg shackles during trial; (5) Failure to move for severance; and (6) Failure to argue for Minimal Participant Role at sentencing (Dkt. 8). The Court will address each challenge in turn.

A.    **Evidence of Cell Phone Locations**

At trial, Drug Enforcement Agency ("DEA") Intelligence Analyst Kristin Schumacher ("Schumacher") presented evidence of the defendants' travels across the United States using information she extracted from cell phone records. Ramirez contends that Champion unreasonably failed to object to Schumacher's presentation on three grounds: that the Sixth Amendment's confrontation clause required that the person responsible for generating the cell phone records—not Schumacher—appear in court and lay the foundation for their admission; that her testimony was inadmissible hearsay; and that her presentation required the Government to establish her as an expert witness. Champion did not oppose her testimony on these grounds.

1.    **Facts**

Schumacher testified extensively on the fifth day of trial (*See* Crim. Dkt. 816 at 182:3–290:18). She began by attesting that she had been employed by the DEA for 17 years and served as an intelligence analyst in the Indianapolis, Indiana district office for 10 years. *Id.* at 182:9–24. Her duties as an intelligence analyst involved interpreting cell phone data. *Id.* at 183:7–9.

Schumacher made clear that she was "not a trained engineer or anything." *Id.* at 183:10. However, by her assessment, she "gained a functional use on how cellular telephones work" through her work for the DEA. *Id.* at 183:10–12. She explained that cell phones in use transmit information to towers; that phone companies log phones' transmissions to specific towers; and that she could use those logs to infer a phone's approximate location (and therefore the user's location) at the time of a transmission. *Id.* at 183:14–187:2.

Aside from her testimony that she learned about cell phone operations in her work, Schumacher did not testify about the basis for this knowledge, and she was not tendered as an expert. The defendants objected to use of cell phone data on grounds that it was obtained without

6

a warrant—an issue further addressed below—but Schumacher's testimony regarding cell phone operations was otherwise received without objection.

After those preliminary matters, Schumacher's testimony followed a pattern. First, she explained how she linked cell phones seized in the investigation to the four defendants. For example, she used rental car reservations made in Ramirez's name and including phone numbers to determine that he used two seized telephones with those numbers (*See* Crim. Dkt. 816 at 214:15–217:3). Then, she explained that she used cell site records to determine where those telephones were located at points in time. *See id.* at 231:6–234:16. She presented maps plotting those locations and explained that they showed routes that the defendants traveled in furtherance of the drug trafficking operation. *Id.* Again, this evidence was received without objection.

### 2.    **Confrontation Clause**

In *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the United States Supreme Court considered the use of a laboratory report in the prosecution of a driving-while-intoxicated charge. The witness called to present the report was not the scientist who prepared it. The court held that the Sixth Amendment's confrontation clause precluded the report's admission unless the defendant had an opportunity to cross-examine the scientist who prepared it and could attest both to the results of the tests and to matters like the chain of custody of the blood sample that was tested. *Id.* at 659–61.

By extension, Ramirez argues that the confrontation clause prevented the Government from introducing cell site records through Schumacher—to say nothing of the testimony and maps she derived from those records. In his view, *Bullcoming* required the government to call an agent of the phone company to present the records and answer any questions about their integrity or how they were generated.

Recently, the Seventh Circuit considered precisely this issue and resolved it in the government's favor. In *United States v. Hill*, 63 F.4th 335 (2023), an agent for the Federal Bureau of Investigation reviewed cell phone records like those Schumacher reviewed, "edited [them] down to those portions he deemed relevant," and presented them as evidence of the defendants' conduct. *Id.* at 357. The Seventh Circuit held that the phone records "were non-testimonial, raw machine created data" not subject to the confrontation clause, and there was no problem with the agent testifying about information he derived from those records. *Id.* at 359.

Had Champion challenged Schumacher's testimony or the exhibits she presented under the confrontation clause, his challenge would have failed. His decision not to raise that challenge therefore could not have violated Ramirez's right to effective assistance. *See Long*, 847 F.3d at 920 ("When a petitioner alleges that counsel was ineffective for failing to move to suppress evidence," he must "prove the motion was meritorious.") (internal quotation marks and citation omitted).

### 3.      <u>Admissibility of Cell Phone Testimony and Evidence</u>

Ramirez notes that Schumacher was not properly established as an expert witness and that she "did testify for the truth of the matter." (Dkt. 24 at 2). The Court understands Ramirez to argue that Champion rendered ineffective assistance by failing to object to Schumacher's presentations as inadmissible hearsay and improper testimony by a witness not established as an expert.

Of course, a record purporting to show that a phone interacted with a particular tower at a particular time is hearsay if offered to prove that a phone associated with the defendant was near that tower at that time. Such records, any exhibits derived from them, and any testimony based on them would therefore be inadmissible under Federal Rules of Evidence 801 and 802. At face value, Champion had grounds to object. But Schumacher testified that the reports were "business records" and therefore an exception to the rule against hearsay (*See* Crim. Dkt. 816 at 186:1–3). That

8

statement alone, however, did not establish all the elements of the business-record exception and therefore would not have defeated an objection on its own. *See* Federal Rule of Evidence 803(6).

Even so, the Court cannot deem Champion deficient for declining to raise a hearsay objection or that this course of action prejudiced Ramirez. Had he objected, there is little reason to doubt that the Government could have obtained testimony or certification from a phone company official to establish that the cell location records were generated automatically and kept in the ordinary course of business. *See id.* "Trial management, tactical and strategic decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence' are all within the lawyer's province." *United States v. McClinton*, 23 F.4th 732, 737 (7th Cir. 2022) (quoting *Robert Leroy Mccoy v. Louisiana*, 584 U.S. 414, 422 (2018)). Champion did not perform deficiently or prejudice Ramirez by declining to put the Government—and the jury—through the paces of establishing the admissibility of evidence that would inevitably be admitted.

Similarly, Champion might have objected that Schumacher failed to establish personal knowledge of the cell phone technology underlying her testimony or technical expertise that would allow her to testify on the matter. *See* Fed. R. Evid. 602, 702. But such objections "are often risky because they can backfire and end up bolstering the credibility of the witness." *United States v. Dukagjini*, 326 F.3d 45, 53–54 (2d Cir. 2003). Objecting to the basis for Schumacher's testimony would have handed the Government an opportunity to present evidence of her years of experience investigating cases like this one and given the jury even more reason to trust her presentation.

In the end, Ramirez provides no basis to suspect that the cell phone records used against him at trial were illegitimate, that Schumacher lacked the knowledge to interpret those records, or that any of her testimony or exhibits were untruthful. The Federal Rules of Evidence have erected

procedural safeguards to ensure that evidence admitted at trial is trustworthy and presented properly, and Champion could have deployed more of those safeguards to ensure the propriety of Schumacher's presentation. But counsel cannot be faulted for declining to employ every safeguard in the absence of any true concern regarding the admissibility of the evidence or Schumacher's qualification to present it. Ramirez's challenges to the use of cell phone location records—based on the confrontation clause and the Rules of Evidence—are **denied**.

**B.    Challenge to Warrantless Seizure of Cell Tower Data**

Ramirez next contends that Champion undertook a constitutionally ineffective effort to suppress the cell evidence on Fourth Amendment grounds. But the Seventh Circuit has already resolved this issue in the Government's favor, and this Court need not consider it further.

The Government obtained the records at issue through the Stored Communications Act ("SCA") (*See* Crim. Dkt. 604-1, 604-2). The text of the SCA allows the government to obtain such records without a warrant, provided that a court issues an order finding that the government has presented "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).

The Supreme Court decided *Carpenter v. United States*, 585 U.S. 296 (2018), on the eve of Ramirez's trial. In *Carpenter*, the court held that the government's procurement of cell phone location records are searches for purposes of the Fourth Amendment *and* that "the Government must generally obtain a warrant supported by probable cause before acquiring such records." *Id*. at 316.

Ramirez and his co-defendants moved to suppress the cell phone evidence as proceeds of an unlawful, warrantless search (*See* Crim. Dkts. 580, 595). The Court denied the motions, finding

that the defendants' cell phone records were admissible through the "good faith exception" to the Fourth Amendment's exclusionary rule (Crim. Dkts. 612, 616). The Court specifically noted that Supreme Court precedent did not "apply to suppress evidence when the Government obtained the evidence while acting in objectively reasonable reliance on a statute that was subsequently declared unconstitutional." (Crim. Dkt. 612 at 6 (citing *Illinois v. Krull*, 480 U.S. 340, 349–53 (1987))). The Seventh Circuit reached the same conclusion in *United States v. Curtis*, 901 F.3d 846 (7th Cir. 2018), and affirmed this Court's decision in denying Ramirez's direct appeal. *Castro-Aguirre*, 983 F.3d at 934–35.

Ramirez asserts that Champion rendered ineffective assistance by failing to confront the good faith exception in his motion to suppress. For at least three reasons, this argument fails.

First, although Champion did not address the good faith exception in his motion to suppress, co-defendant Rafael Rojas-Reyes addressed the issue in his reply (*See* Crim. Dkt. 597). The Court denied Ramirez's motion to suppress on the same grounds it used to deny his co-defendants' motion (Crim. Dkt. 616 at 1 ("For the reasons stated in the Court's Order (Filing No. 612) denying Defendant Rafael Rojas-Reyes' motion to suppress, the Court **DENIES** Defendant John Ramirez[]'s Motion to Suppress (Filing No. 594) based on the good faith exception to the exclusionary rule.")). There is no reason to believe Ramirez would have fared better if Champion also argued against the good-faith exception.

Second, Ramirez's ineffective assistance claim relies on a legal argument that the Seventh Circuit has expressly dismissed, including on the direct appeal of this case. The Court cannot find that counsel performed deficiently by declining to raise an argument that the Seventh Circuit has since foreclosed.

11

Third, the "law of the case" doctrine forbids "a prisoner to relitigate in a collateral proceeding an issue that was decided on his direct appeal." *White v. United States*, 371 F.3d 900, 902 (7th Cir. 2004). Ramirez and his co-defendants litigated the Fourth Amendment issue—including the good-faith exception—on direct appeal. The Seventh Circuit deemed their challenge unmeritorious.[2] He has not identified a more recent change in the law that would allow this Court to upset that decision. Ramirez's Fourth Amendment challenge is therefore **denied**.

### C.     Efforts to Oppose Testimony of Samaniego

Ramirez contends that Champion rendered ineffective assistance by failing to challenge the testimony of cooperating witness Samaniego, who testified at the trial.

#### 1.     Facts

The First and Second Superseding Indictments identify Samaniego as a drug courier who worked with Ramirez and others to transport methamphetamine and cocaine from Castro-Aguirre in California and Arizona to the eastern United States, then return cash to Castro-Aguirre (Crim. Dkt. 142 at 3; Crim. Dkt. 416 at 3).

Samaniego was not charged as a co-conspirator but in a standalone action. *See United States v. Yesenia Samaniego*, No. 1:16-cr-00240-TWP-MJD. Within three months of her initial appearance, Samaniego filed a petition to plead guilty to one count each of conspiring to traffic 500 grams of controlled substances and to launder money; she asserted she would testify against her co-conspirators in exchange for the Government's recommendation that she receive a substantial downward departure in her own sentence. *See id.*, (Dkts. 29, 37).

Samaniego's testimony was extensive, spanning parts of three days and more than 260 pages of the trial transcript. In short, Samaniego made ten cross-country trips, transporting drugs

---

[2] For this reason, Ramirez's contention that his *appellate* counsel was ineffective for failing to challenge this Court's application of the good-faith exception, *see* Dkt. 8 at 13–14, is factually unfounded.

in one direction and cash in the other.[3] She admitted to trafficking over 100 kilograms of drugs.[4] Her testimony painted a damning picture of Ramirez's involvement in the alleged conspiracy. She testified at length that Ramirez accompanied her on several cross-country trips as a drug courier,[5] reserved rental cars and hotel rooms used on those trips,[6] directly handled drugs,[7] interacted directly with bigger players in the operation,[8] and knew he was transporting drugs and money.[9]

In January 2018, the Government sought leave to exclude cooperating witnesses from its witness list citing the danger associated with the drug conspirators and others (Crim. Dkt. 402).The Government stated its intent to call cooperating witnesses and confidential informants to testify regarding the drug conspiracy alleged in the Superseding Indictment, and argued that early disclosure of these witnesses' identities would pose a significant risk to not only their safety but also that of their families (Crim Dkt. 402 at 3). The Government proffered that "the alleged drug organization is known to engage in acts of violence"[10] and at least three of the indicted defendants remained fugitives (Crim Dkt. *Id*. at 4). The Government argued "[t]he nature of the offenses

---

[3] *See* Crim. Dkt. 815 at 90:12–14 (describing "the tenth trip that you took in this case"). This quote is not at this cite

[4] *See* Crim. Dkt. 814 at 151:24–25 ("approximately 30 kilos"), 163:20–24 ("More than 12" kilograms), 173:1–3 (ten packages weighing "about a kilogram" each), 183:11–15 ("Approximately there were 27" kilograms), 239:11–14 ("Around 24" kilograms).

[5] *See, e.g.*, Crim. Dkt. 814 at 152:4–6 (describing trip to Allentown, Pennsylvania).

[6] *See, e.g.*, Crim. Dkt. 814 at 146:6–147:17.

[7] *See, e.g.*, Crim. Dkt. 814 at 163:15–164:4 (describing removing 12 kilograms of cocaine from a tire).

[8] *See, e.g.*, Crim. Dkt. 814 at 150:13–152:3 (describing meeting with Castro-Aguirre).

[9] *See, e.g.*, Crim. Dkt. 814 at 151:17–152:3 (describing being told 30 kilograms of cocaine were in the vehicle), 155:6–8 (being present when money was placed in the vehicle).

[10] The Government recounted that in May 2016, "rival members of the Sinaloa Cartel [] kidnapped" Angel Barrios-Moreno, one of the defendants' suppliers, and "were holding him hostage pending a $500,000 ransom payment." (Dkt. 142: Superseding Indictment). Despite efforts by the defendants, including Castro-Aguirre and Rojas-Reyes, the Sinaloa Cartel executed Angel Barrios-Moreno and two of his companions on or about May 10, 2016. (Dkt. 402 at 4).

charged, the record of violence already present in the case, the defendants' cartel affiliation, and the unknown whereabouts and identities of multiple conspirators demonstrates the need for withholding the cooperators' identities until closer to trial." *Id.*

At that time, eight defendants remained set for trial. Only Rojas-Reyes opposed the motion (Crim. Dkt. 403). Recognizing that in the event pretrial disclosure of witnesses' identities "would pose a threat to their safety," the Court determined that withholding the identifying information was appropriate. *See United States v. Edwards*, 47 F.3d 841, 843 (7th Cir. 1995). Rojas-Reyes' objection was overruled, the motion granted, and the Court ordered the Government to file its final witness list and "*Santiago* proffer" one week before trial and "to confer with counsel" for the defendant's remaining for trial (Crim. Dkt. 494). Consistent with the Court's order, the Government identified Samaniego as a witness one week before trial and summarized her expected testimony in six paragraphs (Crim. Dkt. 637 at 7–9). The public docket, (No. 1:16-cr-00240-TWP-MJD at Dkt. 29), reflects that Samaniego was pleading guilty to possession of methamphetamine and money laundering.

During trial, Champion cross-examined Samaniego with questions about her relationship with her husband, her relationship with Ramirez, and their relative roles in the drug operation (Crim. Dkt. 815 at 106:9–111:3). She conceded that Ramirez had no involvement in the drug business before his association with her and that she introduced him into the activity, but she also testified that both of them maintained contact with others in the operation from that point forward. *Id.* at 111:19–112:2. Most notably, Champion highlighted Samaniego's plea bargain and the Government's agreement to attempt to help her obtain legal permanent residency in the United States "if she testified truthfully." *Id.* at 115:24–118:14. In response, Samaniego attested that she

14

feared being murdered as a reprisal for her testimony if she was returned to Mexico. *Id.* at 118:3–13.

Ramirez argues that counsel's opposition of Samaniego's testimony was deficient in three respects: (1) Champion's failure to challenge the credibility of Samaniego's testimony since she did not testify before the grand jury; (2) failure to challenge the contradicting testimony in the record; and (3) had counsel been aware of all relevant testimonies before trial, he could have identified and prepared a more substantial strategy in challenging Samaniego's testimonies.

### 2.    Analysis

First, the Court notes that Samaniego's failure to testify before the grand jury, which, if true, is not a basis for relief. The Government points out that it need not present every trial witness to the grand jury. *Bracy v. United States*, 435 U.S. 1301, 1302 (1978); *see also United States v. Raineri,* 521 F. Supp. 16, 21 (W.D. Wis. Oct. 29, 1980) ("The purpose of the Grand Jury is not to determine guilt or innocence, but rather to determine whether probable cause exists to believe a crime has been committed."); (Dkt. 21 at 16–17). Any objection on this ground would have been frivolous and relief is not warranted on this issue.

Next, Ramirez argues that Samaniego lied during her testimony, and his counsel did not effectively challenge her contradictory testimony. But Champion cross-examined Samaniego vigorously and did challenge her testimony. Ramirez contends that counsel should have objected to her testimony since it was made in exchange for an agreement. An objection on this basis would have been futile as testimony in exchange for an agreement does not preclude a witness from testifying. *See United States v. Robbins*, 197 F.3d 829, 841–42 (7th Cir. 1999). And not only did Champion cross-examine Samaniego concerning perceived contradictions in her testimony and the benefits she expected from her testimony, so did the three counsels for his co-defendants.

Finally, in his motion and reply brief, Ramirez contends that Champion's ineffectiveness also stemmed from the Government's late disclosure of Samaniego's anticipated testimony (*See* Dkt. 8 at 14; Dkt. 24 at 4–6). His broader point is that Champion did not learn that Samaniego or other cooperating witnesses would testify until one week before trial; so counsel did not have time or resources to prepare for these witnesses' testimony; and he never objected to the late disclosure.

Although Champion failed to object to the Government's motion to exclude cooperators from the witness list, Rojas-Reyes' counsel did (*See* Crim. Dkt. 403). The Court granted the motion stating, "[t]he Government intends to file it's Santiago proffer one week before trial *and will confer with counsel for the defendant's remaining for trial*." (Crim. Dkt. 494) (emphasis added). One week before trial, the Government identified on the docket, twelve cooperating witnesses including Samaniego (*Cf* Crim. Dkt. 599 (31 witnesses) to Crim. Dkt. 634 (43 witnesses)). On the same date, the Government proffered summaries of expected testimony from four of the twelve, including Samaniego (Crim. Dkt. 7 at 11). During trial, testimony from cooperating witnesses was central to the Government's case and dealt serious blows to the defense.

Samaniego's testimony spanned parts of three days. Ramirez takes issue with specific aspects of Champion's cross-examination of Samaniego, including whether he adequately capitalized on apparent discrepancies between her testimony and her cell phone location records. But the question in an ineffective assistance claim is whether counsel's performance was reasonable "considering all the circumstances." *Bridges*, 991 F.3d at 803. Champion cross-examined Samaniego and challenged her credibility over the course of two days of testimony (Dkt. 815, Transcript 671–683). That cross-examination thoroughly covered discrepancies concerning the cell phone location records (Transcript 423), travels to Arizona to transport drugs and currency (Transcript 447–458), and travels to New Jersey to collect drug proceeds and transport money

(Transcript 460–470). The Government argues persuasively that "counsel cannot be found ineffective for declining to quibble about the fact that the cellular telephone records did not line up during the July and August 2015 trips when the hotel and credit card records pertaining to those trips conclusively establish that Samaniego and Ramirez did travel together" (Dkt. 21 at 22). In addition, during her three days on the witness stand, counsel for Rafael Rojas-Reyes, Hector Saul Castro-Aguirre, and Jose Manuel Carrillo-Tremillo extensively cross-examined Samaniego in attempts to impeach her testimony and challenge her credibility, and Champion reasonably did not repeat these same cumulative questions. While Ramirez wishes his counsel had presented more robust cross-examination, he has not shown that his counsel performed deficiently in presenting his defense concerning this witness, nor did his performance prejudice Ramirez.

### D.   **Impact of Wearing Shackles During Trial**

Ramirez contends that Champion rendered ineffective assistance by failing to object to his confinement in leg restraints during the trial (*See* Dkt. 8 at 18–20). He asserts that he was required to stand at several points during the trial—both at the Court's direction and to confer with his interpreter—which allowed the jury to see and hear his shackles (Dkt. 24 at 8–10.)

To maintain the presumption of innocence, "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 544 U.S. 622, 629 (2005). The court may exercise its discretion but must take "account of the circumstances of the particular case." *Id.* at 632. Further, the court must make a record of that analysis. *Id.* at 634 ("The second argument—that the trial court acted within its discretion— founders on the record's failure to indicate that the trial judge saw the matter as one calling for discretion. The record contains no formal or informal findings.").

There is no dispute that Ramirez and his co-defendants wore shackles at trial. Moreover, the Court did not make a record of its analysis as discussed in *Deck*. This is not necessarily problematic, as the *Deck* analysis is only required if the defendant's restraints are *visible* to the jury. As the Government notes in its response, "the Court went to great lengths to ensure the jurors were not aware of the restraints." (Dkt. 21 at 27). "The tables in the courtroom have a backing that prevented the jurors from seeing under the tables. And Ramirez[] was seated before the jurors were brought into the courtroom and the jurors were removed from the courtroom before Ramirez[] was removed from the courtroom." *Id.*

This Court's practice, generally and in this case, includes extensive precautions to prevent jurors from observing defendants' restraints. The record supports Ramirez's assertion that he stood during the trial at the Government's request, at the Court's direction, and without objection from Champion (*See, e.g.*, Crim. Dkt. 814 at 134:15–135:15 (standing to be identified by Samaniego); Crim. Dkt. 816 at 49:13–50:5 (standing to be identified by Fabian Robledo); Crim. Dkt. 820 at 156:8–11 (Court's invitation to stand and stretch during reding of final jury instructions)). Ramirez contends that his shackles were visible and audible during these movements. But there is nothing in the record to show his shackles were seen or heard. The precautions noted in the Government's response would have made that result unlikely. In addition, the Court is aware that the Marshal's wrap tape around the chains to ensure it does not make any noises during trial.

Ramirez does not claim that he brought any concerns regarding noisy shackles to his counsels' attention, or that his counsel refused to address those concerns. The Court notes that Ramirez and his counsel were not hesitant to bring concerns to the Courts attention. On day three of the trial, Champion informed the Court of Ramirez complaint that "they were only getting three hours of sleep" based on the transport hours imposed by the jail (Crim Dkt. 814 at 6). Champion

18

later informed the Court that the deputies did not allow Ramirez to bring his papers to court that morning and that he'd been denied hygiene products (Crim Dkt. 814 at 7). On another date, Champion delivered Ramirez's request that the court inform the jury that he and other prisoners were not provided sufficient meals during the trial, which caused a lack of ability to focus (Crim Dkt. 818 at 7). This request was denied as such matters were not relevant to the trail or appropriate. *Id*. These circumstances show that Ramirez was not hesitant to bring concerns to his attorney's attention and Champion was not hesitant to vocalize such concerns to the Court. Considering the totality of circumstances, and the precautions taken to ensure the shackles are not seen or heard, the Court cannot conclude that jurors saw or heard Ramirez's shackles.[11] Ramirez has not shown that Champion performed deficiently or that he was prejudice by wearing shackles during his trial.

**E.      Cartel Evidence: Motion *In Limine*, Motion for Mistrial, and Severance**

The Court allowed the Government to present evidence that the drug operation was connected to a notorious cartel. The Seventh Circuit found that this evidence was irrelevant and highly prejudicial to the Defendants and that the Court abused its discretion by denying the Defendants' efforts to exclude it. *See Castro-Aguirre*, 983 F.3d at 936–38. However the Seventh Circuit found the error to be harmless, because Samaniego and her husband offered so much inculpatory evidence. *Id*. Ramirez argues that Champion's lack of efforts to exclude the cartel evidence rendered his representation constitutionally ineffective.

**1.      Facts**

Ramirez was never thought to be a member of the cartel (*See* Crim. Dkt. 628 at 2, n.1 ("These witnesses will not identify the fourth defendant, John Ramirez, as a member of the Sinaloa

---

[11] The Court reached this same conclusion in *Carrillo-Tremillo v. United States*, No. 1:22-cv-00561-TWP-MJD, Dkt. 17 at 10, in which the Court dismissed Ramirez's co-defendant's ineffective assistance claim based on failure to object to visible shackling.

Cartel."), 6 ("three of the defendants in the case at bar (Castro-Aguirre, Rojas-Reyes, and Carrillo-Tremillo) formed part of a network that distributed controlled substances.")). The Government's theory of the case was that Castro-Aguirre was a member of the cartel and controlled a national transportation network; that Rojas-Reyes and Carrillo-Tremillo were members of the cartel and led local distribution networks; and that Ramirez was not a member of the cartel but worked as a courier, transporting drugs from Castro-Aguirre to distributors throughout the country. *See id.* at 5–7.

Rojas-Reyes filed two motions *in limine* a month before trial—one seeking to exclude any evidence with cartel references, and another seeking specifically to exclude evidence of the kidnapping-and-murder scheme addressed so thoroughly on appeal (Crim. Dkts. 581, 582). Given the Government's concession that Ramirez had no direct connection to the cartel, he arguably had a stronger argument than his co-defendants to exclude such evidence. Nevertheless, Champion simply moved orally at the final pretrial conference to join Rojas-Reyes' motion (*See* Crim. Dkt. 639 at 1). The Court denied both of Rojas-Reyes' motions *in limine* (Crim. Dkt. 639). In doing so, it acknowledged that Ramirez had a different relationship with the cartel than his co-defendants. *Id.* at 4.

At trial, the four defendants joined in an ongoing objection to testimony regarding the kidnapping-and-murder incident, which the Court overruled (Crim. Dkt. 815 at 46:14–49:10). Champion raised a new objection when the Government presented the newspaper pictures of the victims' bodies, offering to stipulate that the cartel was responsible for the killings. *Id.* at 159:18–162:6. Two days later, after another witness testified regarding the kidnapping and murder, and after a juror asked whether juror information would become publicly available following the trial, Champion orally moved for a mistrial (Crim. Dkt. 817 at 146:14–152:16). Ramirez's co-defendants

20

joined the motion. Champion's argument on the motion concerned prejudice to the defendants generally and did not acknowledge that Ramirez's connection to the cartel was different than that of his co-defendants.

The Court denied the motion for mistrial but welcomed Champion to file a motion in writing. *Id.* at 152:14–16. He never filed a written motion.

### 2.    **Analysis**

Ramirez contends that Champion's approach to the cartel evidence rendered his representation constitutionally ineffective. He specifically frames the issue in terms of a motion to sever his trial from his co-defendants'. The Government responds that any motion to sever would have failed as a matter of law and that the Seventh Circuit held on appeal that the admission of the cartel evidence was harmless error. This issue concerning Ramirez, however, is not so straightforward.

"Counsel's work must be assessed as a whole; it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief." *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005). Ramirez—who is not an attorney—is adamant that Champion should have moved to sever his trial from his co-defendants'. Stepping back, Ramirez's motion and the record present a broader question. There is no dispute that Ramirez's relationship to the cartel was different than his co-defendants'. Yet his counsel did not seize on that difference when moving *in limine* to keep cartel evidence out of the trial or when moving for a mistrial. Champion did not follow up with a written motion for mistrial despite the Court's invitation to do so. Nor did he move to sever Ramirez's trial from his co-defendants' either before the trial or after the cartel evidence was presented.

21

The Government's response addresses only Champion's decision not to move for severance. Given that "[c]ounsel's work must be assessed as a whole," *Peoples*, 403 F.3d at 848, the Court cannot neatly separate that decision from Champion's decision not to file individualized motions *in limine* or for mistrial.

It is not a foregone conclusion, as the Government contends, that a motion to sever would have failed. "District judges have 'wide discretion in determining when the prejudice of joinder outweighs the benefits of a single trial.'" *United States v. Jett*, 908 F.3d 252, 275 (7th Cir. 2018) (quoting *United States v. Carrillo*, 435 F.3d 767, 778 (7th Cir. 2006)). The Government correctly notes that there was evidence that all four defendants participated in the same criminal enterprise and that they were *eligible* for a joint trial. But it addresses the question of whether Ramirez was *prejudiced* by a joint trial including cartel evidence only by observing that the Seventh Circuit found that admission of the evidence was harmless error (*See* Dkt. 21 at 30–31).

In reaching that decision, the Seventh Circuit considered "whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded." *Castro-Aguirre*, 983 F.3d at 938 (internal quotations omitted). There is no indication that the Seventh Circuit considered whether Ramirez was prejudiced by being tried jointly with his co-defendants, given the evidence ultimately introduced and his more attenuated connection to it. The appellate court's written decision certainly did not consider whether a reasonable attorney would have cited his client's more distant relationship to the cartel as a basis for the exclusion of evidence, for a mistrial, for severance, or whether Ramirez would have had a reasonable probability of a different outcome had his attorney pursued those remedies.

For these reasons, Ramirez may pursue relief under § 2255 on the theory that his counsel rendered ineffective assistance with respect to cartel evidence—including, but not limited to, failure to file individualized motions to exclude such evidence or for severance or mistrial.

**F.**    **Mitigating Role Adjustment**

Finally, Ramirez asks the Court to find ineffective assistance based on Champion's failure to seek a "mitigating role" reduction in his offense level according to U.S. Sentencing Guidelines § 3B1.2. Champion did not move for a reduction despite arguing at sentencing—and receiving the Court's agreement—that Ramirez's role in the conspiracy was materially different from other participants' roles (*See* Crim. Dkt. 824 at 12:13–19, 48:1–8).

The Court need not—and cannot—resolve this issue now. The Government contends that a mitigating role reduction would not be warranted based on the extent of Ramirez's activities as a courier and his interaction with higher-level participants in the operation (*See* Dkt. 21 at 33–34). The Court is not so sure. Ramirez has filed several submissions of Supplemental Authority concerning his sentence and contentions that because he was "merely a courier," the guidelines and recent case law present additional persuasive authority and consideration for the Courts review (Dkts. 29, 30 and 31).

Because the Court cannot dismiss this claim out of hand, and because the § 2255 action will continue regardless, Ramirez may pursue § 2255 relief based on counsel's failure to pursue a mitigating role reduction.

## IV.    CONCLUSION

For the reasons stated above, Ramirez's Amended Motion to Vacate his conviction and sentence pursuant to 28 U.S.C. § 2255, Dkt. [8], is **DENIED** in part and remains **UNDER ADVISEMENT** in part. The issues addressed in Parts III (A) (B) (C) and (D) are **denied** and

**dismissed**. The issues addressed in Parts III (E) and (F) remain pending and subject to further proceedings. In addition, the Motions For Case Status and Ruling, Dkts. [32][33], are **GRANTED** in that this order states the status of this case and issues a partial ruling.

The Indiana Federal Community Defender ("IFCD") is appointed pursuant to 18 U.S.C. § 3006A to represent Ramirez in this case. The **IFCD shall have seven (7) days** from the date this Order is docketed, in which to appear in this action. Should the IFCD be unable to represent Ramirez, substitute Criminal Justice Act counsel may seek leave to appear on his behalf pursuant to 18 U.S.C. § 3006A(a)(2)(B).

Counsel for Ramirez will have **through May 7, 2026**, to file a supplemental brief addressing the issues that remain in this action. Those issues are whether Ramirez was deprived of effective assistance of counsel considering Champion's:

1) failure to oppose the admission of cartel evidence or seek severance or mistrial; and

2) failure to seek a mitigating role reduction.

The supplemental brief must include a statement of what discovery (if any) is necessary to properly develop each issue.

The Government shall have no later than **June 7, 2026**, to file a Supplemental Response. The Supplemental Response will also include a statement of what discovery, if any, is necessary to develop each issue from the Government's perspective.

The Court will issue further orders after supplemental briefing is complete.

The Court encourages the parties to confer and determine whether this matter may be resolved by agreement or stipulation.

**SO ORDERED.**

Date:   3/31/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

John Ramirez-Prado
Register Number: 22927-479
FCI Miami
FEDERAL CORRECTIONAL INSTITUTION
P.O. BOX 779800
MIAMI, FL   33177

Bradley A. Blackington
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
bradley.blackington@usdoj.gov

INDIANA FEDERAL COMMUNITY DEFENDERS